UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

FILED

AUG 17 2005

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| CHAD A. NOVAK, | \* | CIV. 04-4056 |
| Plaintiff, | \* | |
| | \* | **FINDINGS OF FACT** |
| -vs- | \* | **and** |
| | \* | **CONCLUSIONS OF LAW** |
| SIOUX VALLEY HEALTH PLAN, | \* | |
| Defendant. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

A Court trial was held in his matter on Wednesday, March 30 and Thursday, March 31, 2005. Thirty-four exhibits were received into evidence, and seven witnesses testified at trial. In addition to their opening statements and closing arguments, counsel ably and thoroughly briefed the issues before trial in their summary judgment papers. The Court enters the following Findings of Fact and Conclusions of Law after a careful review of all the relevant testimony and evidence.

## INTRODUCTION

This matter arises under the COBRA provisions of ERISA. The issue to be determined is whether the Defendant properly terminated Plaintiff's health insurance benefits for non-payment of premiums. The Plaintiff asserts benefits should not have been terminated because Defendant did not inform him of the premium he owed to pay for his COBRA coverage. Defendant asserts it informed Plaintiff of the premium amount on two separate occasions: when the COBRA rights notification packet was mailed to Plaintiff in late October, 2003, and again when an invoice was mailed to Plaintiff in mid-November, 2003.

## JURISDICTION

Jurisdiction is appropriate pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132. Both parties consented to the Magistrate Judge presiding over the case, pursuant to 28 U.S.C. § 636(c)(1).

## TESTIMONY

Seven witnesses testified at trial. Their testimony is summarized below:

1. **Plaintiff, Chad Novak**

Mr. Novak was employed by Showplace Wood Products from October 16, 2002 until September 27, 2003. He elected to participate in Showplace's health insurance benefit through

Sioux Valley Health Plan. Mr. Novak paid a portion of the premium through payroll deduction (approximately $26.00 per check, every two weeks), and his employer paid the remainder. Mr. Novak received information from his employer regarding his health insurance, including what portion of the premium would be deducted from his paycheck, when he began his employment at Showplace.

In January, 2003, Mr. Novak fell on the ice while walking into the building at Showplace. He submitted a worker's compensation claim and sent the medical bills to the worker's compensation insurance carrier, but the worker's compensation claim was eventually denied in July or August, 2003. Mr. Novak sustained a low back injury and was referred to Dr. Alvine in April, 2003. Dr. Alvine performed an MRI and diagnosed a nerve root injury. Dr. Alvine performed two steroid injections, and ultimately recommended surgery. The surgery was scheduled for October 20, 2003. Mr. Novak obtained pre-approval for the surgery from Sioux Valley Health Plan (see Ex. 1) on September 15, 2003, while he was still employed by Showplace. On September 27, after the surgery was approved but before it was performed, Mr. Novak's employment at Showplace was terminated when he returned late from his lunch break because his car broke down.

Mr. Novak checked with the human resources manager at Showplace, Dr. Alvine's office, and Sioux Valley Health Plan to inquire about the availability of COBRA health care benefits to cover the scheduled surgery. Because he understood COBRA coverage would be available, Mr. Novak proceeded with the surgery on October 20. He was hospitalized for a few days, and after his release he received a packet of information regarding his COBRA rights on October 24th or 25th, from Sioux Valley Health Plan. The packet arrived in the mail at his home address. Included in the packet was a three page letter (see Ex 2) explaining his benefits. Also included was a form (Ex. 3) which Mr. Novak completed and returned, indicating he wished to elect COBRA benefits.

On cross-examination Mr. Novak admitted he understood he would not have insurance coverage if he did not pay premiums. Mr. Novak testified, however, that after reading the explanation letter, he did not understand what the cost of his coverage would be, nor when he needed to pay. He asserted the letter and the election form were the only two documents in the COBRA notification packet except for the stamped, self-addressed envelope, in which he returned the election form on the same day he received it. He denied receiving the certificate of creditable coverage (Ex B) or the "rate sheet" (Ex C) which contained the information concerning his monthly premium rate. Mr. Novak did have all the information he needed to make the decision regarding whether to elect COBRA coverage, and he decided to elect coverage. He did read the letter he received from the Plan, which informed him he had 45 days from the date of election to make his

first premium payment, and that he was obligated to make payment even if he did not receive an invoice. Mr. Novak signed and returned the election form on October 25, 2003. Although Mr. Novak testified he did not know what the cost of coverage would be he stated he expected the cost would be between $200 and $500 per month. Mr. Novak testified he was prepared to either pay the money himself or borrow the money from his family, because he needed the planned surgery.

Mr. Novak testified he called Sioux Valley Health Plan during the first week in November. He cannot recall the phone number he called, but he believes he obtained the number from a piece of correspondence from the Plan. He did not make any notes of the call. Mr. Novak says he spoke with a female but he cannot remember her name or her position. He thinks she was with customer service. He asked how much he owed. The woman asked for his name and member (social security) number but said she could not access his records, but that he would receive an invoice according to standard procedure and he would receive that information in the mail. Mr. Novak did not ask when he would receive the invoice. Mr. Novak received an enrollment card (Ex. 4) from Sioux Valley Health Plan on or about November 19, 2003.

Mr. Novak called the Plan on December 5 to inquire why some bills from earlier in the year had been paid and others had not. He did not ask how much he owed for his COBRA premium, or when it was due, during the December telephone call. Mr. Novak explained he did not ask about the premium or the amount due because he had been told during the earlier phone conversation in the first week in November that an invoice would be forthcoming and he assumed that it was probably a time consuming process just as claims processing was. He also stated, however, that he was looking for an invoice, expecting it, and checking the mail every day for it. On cross examination, counsel inquired about a copy of an invoice outlining the premiums due for Mr. Novak's COBRA coverage. The invoice (Ex. I) contained Mr. Novak's correct home address and is dated November 20, 2003, but he denied receiving it.

On January 2, 2003, Mr. Novak received a letter from Sioux Valley Health plan, (See Ex. 9) terminating his COBRA coverage retroactively to October 1, 2003, for non-payment of premiums. Mr. Novak testified he would have paid his COBRA premium if he had known how much to pay, just as he paid his other medical bills. Mr. Novak acknowledged outstanding medical bills he had not paid (Ex D, E, F, G and part of H) pertaining to medical services incurred before he lost his health insurance, however, and explained he had not paid those bills because the injury to which they relate (the same injury which necessitated the back surgery for which he wanted to obtain COBRA coverage) are "currently in litigation." Specifically, Mr. Novak is apparently pursuing a personal injury action against Showplace in connection with his back injury. Mr. Novak

differentiated the insurance premium bills from the unpaid medical bills because he wanted to be sure he had insurance coverage in the event his litigation was unsuccessful. To date, the bills Mr. Novak incurred relating to his back surgery in the fall of 2003, totaling $43,350.20 (Ex. 10) have not been paid.

### Mr. Jerry Larson

Mr. Larson is the business manager for the Medical X-Ray center in Sioux Falls, South Dakota. He oversees the billing services for that business, which provides the diagnostic services for McKennan, Sioux Valley, and the Veteran's Administration Hospitals in Sioux Falls. Mr. Larson testified that Medical X-Ray Center posts payments received within a day or two of receipt. Mr. Larson testified regarding a number of postings made on December 29, 2003 (Ex. 11) regarding a payment received from Sioux Valley Health Plan for services provided to Mr. Novak. The payments were received in the mail, and then processed within a day or two of receipt. Those payments were later reimbursed to Sioux Valley Health Plan when it was determined Mr. Novak was not eligible for benefits.

### Cecily Tucker

Ms. Tucker is the Chief Financial Officer of the Sioux Valley Health Plan. She is primarily responsible for the financial reporting, budgeting, forecasting, and planning of the health plan. The other departments within the Plan are member services, information technology, enrollment, health services, claims, marketing, and provider relations. The finance department oversees the invoicing procedures for group health insurance and COBRA health insurance participants. The Plan insures a couple hundred COBRA participants. Ms. Tucker estimated the Plan sends approximately 300 invoices per month, including COBRA invoices.

Ms. Tucker is a CPA with a four year college degree in business. She supervises five employees, and has been employed by the Plan for seven years. She joined the Plan shortly after its inception and has been the CFO since 2000. Ms. Tucker prepared Ex 12, which is the one of the Plan's policies regarding billing practices for COBRA and medicare individuals. The policy provides that the goal is to invoice on or about the 15th of each month. Ms. Tucker indicated that the end of the year is very busy, and in December of each year, invoices are pushed back into January, resulting in two invoices being sent in January.

Ms. Tucker has read the federal statutes regarding COBRA, and it is her understanding that there is no requirement to send an invoice. She agreed that it is important for the notification packet to contain information regarding the cost of COBRA coverage and due dates for payment. Finance also mails termination letters. The participant has 45 days from the date they elect coverage to make

their first payment. The enrollment department determines the date of elections. Ms. Tucker acknowledged Ex. I showed a due date (December 1) which was shorter than 45 days from the date Mr. Novak signed his election form (October 25). All invoices are due the first of the month, but no action was taken to terminate coverage before the 45 day period expired. The termination process is reviewed at the end of the month when receivables are reviewed. At that time, records are reviewed to determine when payment grace periods have expired for non-payment. If the grace periods have expired, then termination letters are sent.

Ms. Tucker also prepared Ex. 13, which is a policy regarding COBRA past due accounts. She explained the Plan has over 100 such policies. Policies are distributed for review to whichever employees are affected by them in their departments.

Ms. Tucker explained that the enrollment department and member services department are separate departments which are both supervised by Tammy Haberer. Enrollment has two employees. Ms. Tucker was unsure how many employees were in the member services department. Ms. Tucker explained how COBRA invoices are prepared. Karissa Harkin uses the Diamond computer system to input data based on members COBRA effective dates, the bill cycle, and other information to create a "job" which determines who needs to receive a bill. A member receives their first invoice during the first billing cycle after they are entered into the Diamond system by the enrollment department. When the job is run in calculate status, Ms. Harkin can view the status in a Crystal Report. Ms. Harkin has the job (the "pre-bill") reviewed by Sylvia Thompson to see whether any additions or subtractions need to be made. If any changes need to be made, the initial job is cancelled, the changes are made, and the job is re-run. The invoices are delivered to Sylvia, who does a final review or audit for accuracy as she stuffs the envelopes. Sylvia places the invoices in window envelopes and places them in mail trays. A mail clerk carries them to the mail room, places postage on them, and puts them in the mail box. Ms. Thompson worked in the finance department for a few years as an accounting clerk, but is currently in the provider relations department.

As an accounting clerk, Ms. Thompson posted payments and fielded telephone calls. Questions from COBRA members about invoices are routed from customer service to the finance department if they are finance specific, because people in people in finance are best trained to handle such questions. Sylvia Thompson handled questions from customers about their invoices or payments during the fall of 2003. The Plan had a policy about such calls (Ex. 12). The policy required all such calls be documented in the online phone log, which is part of the Diamond computer system. At no time was any employee authorized to tell a member not to worry about how much they owed, because they would receive an invoice. Ms. Tucker testified that there is also a

paper file which would be available to access a COBRA rate if for any reason the information was not available on the computer.

The Plan converted computer systems (to the Diamond system) in 2003. The conversion was complete in October 2003. The previous program could not do transactions electronically. A business decision was made to change the member's ID number from his/her social security number to a different number, and this process was part of the computer conversion. The transition was smooth, and Ms. Tucker was not aware of any complaints.

### Tammy Haberer

Ms. Haberer is the manager of member services for Sioux Valley Health Plan. She has worked for the plan since October, 1997. She also supervises the enrollment department. Wendy Lacey and Bonnie Munoz are employed in the enrollment department, and there are four employees in the member services department. There are two main telephone numbers to contact member services. The telephone numbers are located on the members' identification card, marketing materials, and in the telephone book. The number on the Sioux Valley Health Plan letterhead is a general number, but if a customer asks for member services their call will be routed to member services.

Ms. Haberer assisted in drafting the Plan's COBRA enrollment notification documents (Ex. 17) along with a consulting firm. The requirements found in Ex 17 have changed somewhat in 2004 since the Department of Labor issued new regulations. Ms. Haberer was not asked and did not explain what specific changes have been made.

Ms. Haberer explained Ex B is a Certificate of Coverage–a document which is created using the Diamond computer software and ordered by Wendy Lacey from the IS[1] department as part of a batch order. She also explained that Ex C, the rate card, is not prepared on the Diamond software, but is rather a word processing document, which is printed by Bonnie Munoz. The Notification letters (such as Ex 2) are also ordered from the IS Department in a batch order. The election forms (such as Ex 3) are triplicate forms. Bonnie Munoz uses the documents the Plan receives from the employers (the notice of qualifying event form) which triggers the COBRA notification to audit the process and assemble the packets with the four required documents for each participant. Ms. Munoz collates and assembles the documents, along with a self-addressed envelope for mailing to the participant.

The Plan received a qualifying event form from Showplace regarding Mr. Novak on October

---

[1] The parties did not explain what "IS" means. Presumably IS means Information Services.

10, 2003. (Ex. L). When such a form is received it is routed to the enrollment coordinator (Wendy Lacey). She determines the last date of coverage, which in Mr. Novak's case was September 30, 2003. That is entered into the computer system, and the COBRA notification letter is ordered from the IS department. Ex M is a copy of the note screen from the Diamond computer system which shows activity on Mr. Novak's account. The COBRA notification letter and certificate of creditable coverage are ordered from IS as part of the same process. Ex M shows that the COBRA information was sent on October 23. After the letter and certificate are ordered, the qualifying event form is provided to Bonnie Munoz so she can pull the appropriate rate information, based on the appropriate employer, because each employer has a different rate schedule. Bonnie then uses the qualifying event forms to audit the documents and collate and assemble them into envelopes. Ms. Haberer has observed Bonnie Munoz's work and her work has been audited by another department. It has been close to 100% accurate.

Ms. Haberer testified that while it is possible not all four documents got into the COBRA notification packet, there is a very well defined policy regarding the procedure for assembling the packet. She also stated the conversion to the Diamond system did not change the way in which the COBRA notification packet was generated. Ms. Haberer testified the Diamond system went live in September, 2003, and that all departments within the Plan went live at the same time.

When an enrollment form is completed and returned by a participant, it is routed to the enrollment coordinator. Mr. Novak's completed form is Ex 3. Mr. Novak's election form was timely. His application was received on October 28, and processed on November 13. As soon as it was entered into the computer (November 13), his member record would have reflected that he should receive an invoice for the November billing cycle on November 15.

When an enrollment application has been received and reviewed, a member ID card is generated. The day an election form is received in the mail, the receipt is noted in the computer. The member's status is changed from active or terminated to COBRA. ID forms are printed on Tuesdays and Thursdays, and a COBRA participant's card is printed on the first Tuesday or Thursday after his or her application is processed.

Ms. Haberer explained the 45 day period for a COBRA participant to make a premium payment is based on the date of election. That date is not known when the election letter is mailed, because the participant has 60 days to decide whether to elect. The box on the election form which the participant checks states "I elect . . ." and the participant signs and dates the form.

Ms. Haberer also supervises customer service employees. Ex. N is a policy regarding the documentation of telephone calls. If a caller asks a question regarding the finance department, the

call should be documented, and then transferred to the finance department for further handling pursuant to the policy contained in Ex 12. The customer service employees are trained to follow this policy. The person who handles telephone inquiries in the finance department is Sylvia Thompson. Ex O is a complete telephone log of calls regarding Mr. Novak. Ex O contains no record of a call from Mr. Novak regarding a question about his COBRA premium. Ms. Haberer has never authorized or directed an employee to tell a customer not to worry about a COBRA premium because they would be getting an invoice. She would not authorize such a response because it does not resolve the problem. If a question cannot be answered immediately, she would direct the representative to find the answer and call the customer back.

Member Services is responsible for handling telephone inquiries regarding COBRA policies. Three computer screens appear and information is entered on those screens in connection with incoming calls from customers. Information regarding premiums does not appear on any of those three screens. If a member who has been terminated from group coverage but who has not yet elected COBRA calls, their call is logged just as any other member's call is logged. If the computer phone log system is inoperable, employees log phone inquiries on paper until the computer is operational. Employees are tested regarding their knowledge of subject matter about the Plan via direct observation of their work, and documentation of their knowledge of and adherence to the policies and procedures. Member services employees are required to be familiar with finance policies as they pertain to their job duties.

Ms. Haberer calculated the amount the Plan would have paid in connection with Mr. Novak's October, 2003 back surgery. That amount is contained in Ex P, which is filed under seal. It calculates the amount the plan would pay considering Mr. Novak's deductibles, co-payments, and the Plan's agreements with the various medical providers.

**Karissa Harkin**

Ms. Harkin is an accountant with the finance department at Sioux Valley Health Plan. One of her job responsibilities is to calculate billings for COBRA and commercial accounts. During the fall 2003, Ms. Harkin calculated the COBRA billings. She recalls the Plan began using the Diamond computer system in September, 2003. The former billing software (Amysis) was used to calculate bills in conjunction with Diamond in October to verify accuracy.

To calculate a job, Ms. Harkin enters the bill type and job type and the date to bill through, then calculates the job. Then she goes to the Crystal program to view the invoices. Ms. Harkin then saves the file as an Adobe file, for review by Sylvia Thompson. Ms. Thompson reviews the file to determine whether there are any additions or corrections. If there are none, the job is posted, and the

Adobe file is saved and the Crystal program is again used to print the invoices.

Ms. Harkin received training in the Diamond system before it was put into use. She did not experience any problems with the Diamond system after it was put into use.

### Bonnie Munoz

Ms. Munoz is employed by Sioux Valley Health Plan in the enrollment department. She was trained by Wendy Lacey when she started at the Plan. She reviewed policies pertaining to her job and reviewed several operational manuals. The manuals remain at her desk available for her review if she has any questions.

Ms. Munoz prepares the COBRA notification packet. It contains a notification letter, a certificate of coverage, a cobra rate sheet, an election form, and a return envelope. IS prints the letters and delivers them to Bonnie. The certificates of coverage are also prepared by IS and are delivered along with the notification letters. She matches the letters and certificates with the enrollment form and a rate sheet. The qualifying event forms are provided to her by Wendy Lacey, and she uses those forms to request the rate sheets based on the place of employment for the participants. She prints the rate sheets (a Word document) and matches them to the notification letters and certificates of coverage. She double checks to make sure all necessary documents are included in the packet, stuffs all the documents into the envelopes, seals the envelopes with tape, and delivers them to the mail room. She usually prepares fifteen to twenty five COBRA packets at one time.

Ms. Munoz's work is reviewed or audited from time to time. The audit consists of someone reviewing documents before she mails them out, and before the envelope is sealed. She has never been disciplined for sending a COBRA packet that did not contain all required documents. She would not send out a COBRA packet without one of the required pieces of information, because there is a policy (Ex 17) which requires certain documents be contained in the packet.

### Sylvia Thompson

Ms. Thompson is employed by Sioux Valley Health Plan in provider relations. She was previously a finance clerk, until sometime in 2004. Ms. Thompson's duties as a finance clerk included sending invoices, working with customers (COBRA customers and medicare supplement customers), posting cash and check payments, and fielding phone calls. The phone inquiries included calls regarding the amounts owed, when payment was due, or any other questions regarding payment or premiums. Sylvia took these calls because she was the person who posted payments. Policy required that all calls regarding payment inquiry be documented in the Diamond computer system.

Ms. Thompson used the Diamond system to document phone calls. She does not recall ever taking a call without documenting it. She documented every call because she realized the importance of other employees of the Plan being able to access whatever information had been provided to the participant. If a participant ever had a question she could not answer, she would document the call, find the answer, and call the participant back with the answer, also documenting the return call. If the computer system was not operational when a member called, Ms. Thompson would take notes on paper and log the information on the computer when the computer became operational. The information regarding premium rates can be accessed without access to the computer, because Ms. Thompson had printed out a book with the premium rates in it. Ms. Thompson does not recall ever telling a caller not to worry about how much their premium rate would be because they would be receiving an invoice. She would not tell a caller such a thing, because she can access rate information without accessing the computer.

If she received an inquiry about when an invoice would be coming, she would look at their history to see what months they had been billed for, and when the billing would be sent again, or if they had not been billed yet. If the person was a new COBRA participant, she would explain they had 45 days from the date they signed their application, and that they usually billed on the 15th of the month, even though they were not required to send COBRA invoices.

Ms. Thompson also was involved in preparing COBRA invoices. Karissa Harkin prepared pre-bills for her review in an Adobe file. Sylvia reviewed the pre-bills for billing dates, applicability of the 45 day time frame, a 30 day grace period, and for accuracy, and if everything appeared in order, Karissa would run a job and invoices would be printed. Ms. Thompson also kept notes, including e mails from the member services department regarding new members that had been added throughout the month noting the effective date for billing purposes, and she checked the invoices each month to be sure the new members who had been added received an invoice with the correct effective date. These notes were simply a way to double check to make sure the new members got an invoice–the new members' invoices were automatically generated once their applications were processed and their information had been entered into the system.

Sylvia received the invoices, stuffed them into envelopes, and placed them into mail trays and took them to the mail room for mailing. Ms. Thompson has no specific recollection of preparing Mr. Novak's invoice (Ex I). She did not count the envelopes or invoices and compare them to the number of invoices contained in the Adobe file.

Ms. Thompson explained that although the invoice prepared for Mr. Novak shows a due date of December 1, no action to cancel his coverage would have been taken before 45 days after he

signed his COBRA application. Before COBRA coverage was terminated, a Plan employee always reviewed to determine whether a grace period was applicable. When no payment was received as a result of the November invoice, the invoice which was prepared for Mr. Novak in January was not sent and the charges were reversed (Ex K) because Mr. Novak was terminated from the Plan for non-payment of premiums.

## PRELIMINARY ISSUES

Two evidentiary issues were taken under advisement at trial. First, Defendant objected to Plaintiff's reference to his un-documented telephone call to the Plan in early November on hearsay grounds. Second, Defendant objected to Plaintiff's reference to any changes the Plan made to the COBRA notification packet after the implementation of the Department of Labor regulations in 2004.

### 1.    The November Telephone Call

The November telephone call will not be considered for a couple of reasons. Plaintiff asserts his alleged conversation with a Plan representative should be admissible pursuant to Fed. R. Evid. 801(d)(2)(D). Plaintiff, however, testified he did not take any notes of the phone call. He cannot remember exactly what date he called, although he is relatively certain it was during the first week in November. He cannot remember what phone number he called, but he believes he got the number from a piece of Plan literature. He does not know with whom he spoke or what department the person was with. Ms. Tucker and Ms. Haberer both testified that according to Plan policy, any questions received through customer services about billing, premiums, or amounts owed were to be documented and referred to the employees in the finance department. In other words, employees in any other department would not have been authorized to answer to such questions or to speak on behalf of the Plan about such matters.

"In order for a statement to be admissible under Rule 801(d)(2)(D), the offering party must make a threefold showing, through evidence independent of the proffered statement, that (1) an employment relationship existed between the declarant and the party, (2) the statement was made during the agency or employment relationship and (3) the statement concerned a matter within the declarant's scope of employment. " Brewster v. United States, 860 F. Supp. 1377, 1385 (S.D. Ia. 1994) (citations omitted). In other words, it is not enough that the speaker was merely employed by the agent. "It is well established that Rule 801(d)(2)(D) requires the proffering party to lay a foundation to show that an otherwise excludable statement relates to a matter within the scope of the agent's employment . . . here, Brewster has failed to establish that the statements made by the alleged employees of VAC. concerned a matter within the scope of any of the declaring's respective

employment with VAC." Id. at 1386. Likewise, Mr. Novak did not provide sufficient foundation to show the person with whom he allegedly spoke was a member of the finance department, authorized to speak to him about billing issues.

Alternatively, the Defendant has shown by a preponderance of the evidence that Mr. Novak's claim the November telephone call was made but not logged, and the substance of the call, is entitled to little or no weight. Ms. Haberer and Ms. Thompson testified that all member phone inquiries were logged, even if the computers were not operational when the call came in, because handwritten notes were kept to be entered into the computer as soon as they came back online. Ms. Haberer explained that if a participant who had been terminated from group coverage but had not yet elected COBRA coverage called, his phone inquiry would be logged just as any other call would.

Ms. Tucker and Ms. Thompson both testified that even if the computer system was experiencing problems and his records could not be accessed as Mr. Novak claims, a Plan employee could access COBRA rate information because that information is available on paper, simply by asking the member the name of his former employer. Both, along with Tammy Haberer, also testified that it would never be acceptable to simply tell a member that they should not worry about how much their premium would be because they would be receiving an invoice in the mail. Also, the Plan employees explained that the Plan converted to the Diamond computer system in the fall of 2003 (Ms. Tucker said the conversion was complete by October, 2003, and Ms. Haberer and Ms. Harkin testified the conversion occurred in September, 2003). Ms. Tucker explained that as a part of that conversion, participants' identification numbers were changed from their social security numbers to a different number. Ex B (a document which Mr. Novak denies he received, but which was generated on October 24, 2003) shows Mr. Novak's ID number as something other than his social security number. Mr. Novak testified, however, that when he called to inquire about his premium during the first week in November, the person who spoke with him asked for his social security number. Because by November, 2003, the members' ID numbers were no longer their social security numbers, there would have been no reason to ask for his social security number in order to access his information. Likewise, if his request for information was for premium rates, that information could have been accessed by requesting the name of his former employer and without the use of a computer at all, as explained by Ms. Thompson and Ms. Tucker.

Finally, there was a December phone call made by Mr. Novak (which is documented) in which he inquired about some outstanding medical bills which had not been paid. Mr. Novak admitted (which he must) that he did not inquire during that phone call when the invoice for his COBRA benefits might be arriving, or for how much the invoice would be, despite his claim that

he had called the Plan nearly a month earlier and had been assured that an invoice would be forthcoming. Mr. Novak testified that during this same time frame, he was expecting an invoice, was looking for it, and checking the mail every day for it because it was very important to him. If in fact he had been assured a month earlier that an invoice would be arriving, and in light of the fact that an ID card had arrived in the interim (on November 19), it is more probable than not that he would have inquired about the invoice during the December telephone call. For all of these reasons, Mr. Novak's claims regarding the occurrence and substance of the November telephone call are rejected.

### 2. Changes to the COBRA Notification Packet

There is really not much to rule on regarding this issue. Although there was passing reference made during Tammy Haberer's testimony about some changes that have been made to the Plan's notification packet since the Department of Labor issued its regulations in 2004, she was not asked and did not testify about the specific changes that have been implemented. In any event, Fed. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pursuant to Rule 402, all relevant evidence (with a few exceptions) is admissible and irrelevant evidence is not admissible.

Changes made to the notification packet to conform with the 2004 regulations have no relevance to a notification sent in November, 2003, and are, therefore, inadmissible pursuant to Rules 401 and 402. See generally Turner v. General Motors Corp. 584 S.W.2d 844, 852 (Texas 1979) ("As a general rule, post-event regulations are inadmissible."); Oberreuter v. Orion Industries, Inc., 398 N.W.2d 206, 210 (Ia. 1986) ("Exhibits consisting of OHSA standards promulgated *after* the sale of the machine in question were clearly irrelevant and inadmissible."); United States v. Henny, 527 F.2d 479, 484 (9th Cir. 1975) cert. den. 425 U.S. 991, 96 S.C. 2201, 48 L.Ed.2d 815 (1976) ('[M]uch of the proffered evidence related to industry-wide standards, but the evidence was irrelevant because ... it post-dated the relevant time frame..."). Evidence regarding changes made to the contents of the notification packet is also inadmissible as a subsequent remedial measure pursuant to Fed. R. Civ. P. 407:

> When, after injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasability of precautionary measures, if controverted, or impeachment.

The Plan did not controvert the feasability of changing the contents of the COBRA notification packet, so the subsequent remedial measure rule applies in this case. That changes were made to the contents of the notification packet after November 2003, whatever they were, will not be considered.

## DISCUSSION

### *Findings of Fact*

1. Plaintiff Chad Novak was employed by Showplace Wood Products from October 16, 2002, until he was terminated on September 27, 2003.
2. While employed by Showplace, Plaintiff participated in its health insurance benefit through Sioux Valley Health Plan.
3. Plaintiff's termination was a qualifying event under COBRA, 29 U.S.C. § 1163(2).
4. Defendant Sioux Valley Health Plan was the plan administrator.
5. Showplace provided notice of the qualifying event to the plan administrator on October 10, 2003. (Ex. L).
6. COBRA requires that the plan administrator provide notice to employees of their COBRA rights within fourteen days of receipt of their notice of the qualifying event. 29 U.S.C. § 1166(a)(4)(A) & (C).
7. Defendant implemented a regular company procedure to ensure potential COBRA participants properly received notice of their COBRA rights. The procedure included the assembly and mailing of a COBRA notification packet, which included four documents (notification letter, election form, rate sheet, and certificate of creditable coverage) along with a stamped, self-addressed envelope.
8. The employee who regularly assembled the COBRA notification packets has never been disciplined for failure to include all the necessary documents, and has a near 100% accuracy rate.
9. Plaintiff received his COBRA notification packet.
10. There is a dispute about what was contained in the packet, but Plaintiff read the letter contained in the packet which informed him that if he elected COBRA coverage, he had 45 days from election to make his first premium payment, and that he was obligated to make the payment even if he did not receive an invoice.
11. Plaintiff signed and returned the form which indicated he desired to elect COBRA coverage. The election form was signed and dated October 25, 2003. Forty-five days from October 25, 2003 was Tuesday, December 9, 2003.

12. Plaintiff's COBRA election was processed on November 13, and his record immediately reflected that he should receive an invoice for the November billing cycle.

13. Plaintiff received an enrollment card (Ex 4) from Sioux Valley Health Plan on or about November 19, 2003.

14. Defendant implemented a regular company procedure to ensure enrolled COBRA participants received monthly invoices.

15. The invoice procedure included the use of the Diamond computer system, and the procedure was implemented as usual in November, 2003.

16. Defendant's invoice procedure included Karissa Harkin inputting data to create a job to determine the COBRA members who would receive a bill. The job ran in the calculate status and could be viewed as a "pre-bill" in a Crystal report. The Crystal report was saved as an Adobe file for review by Ms. Harkin's supervisor, Ms. Thompson. After Ms. Thompson reviewed the file, the job was posted, the Adobe file was saved, and the Crystal program was again used to print the invoices. A record of this process was kept using the Diamond computer program, and was produced to the Court as Exs. I, J and K.

17. Ex. J shows that on November 20, 2003, Job No. 20993 was posted.

18. Ex I is a copy of the invoice that was generated on November 20, 2003, for Chad Novak.

19. It is undisputed that the address which appears on Ex I was the current address for Plaintiff at the time in question.

20. Ex. K is a copy of the billing history for Chad Novak, which shows an invoice was generated on November 20, 2003.

21. Afer the monthly invoices were generated, Ms. Thompson received them, stuffed them into envelopes, placed them into mail trays, and delivered them to the mail room for mailing.

22. Despite the evidence presented by Defendant regarding the regular company procedure for mailing COBRA invoices and Exs. I, J, and K, showing an invoice was generated for Plaintiff in November, 2003, Plaintiff Chad Novak asserts he did not receive a monthly invoice in November, 2003.

23. Plaintiff never paid a premium for his COBRA coverage.

24. Defendant sent Plaintiff a letter dated January 2, 2003 (sic)[2] terminating his health insurance coverage effective October 1, 2003, for non-payment of premiums.

25. January 2, 2004, was beyond the forty-five day time limit for payment of the first COBRA premium payment (December 9, 2003).

26. Any of the foregoing Findings of Fact which are more appropriately deemed Conclusions of Law are incorporated by this reference into the Conclusions of Law which appear below.

*Conclusions of Law*

1. This Court has subject matter jurisdiction over Plaintiff's COBRA claim pursuant to 29 U.S.C. § 1132(e)(1) and (f).

2. The District of South Dakota is the proper venue for this action. 29 U.S.C. § 1132(e)(2).

3. All necessary and indispensable parties are parties to this action.

4. Plaintiff Chad Novak's termination from Showplace Wood Products was a qualifying event which triggered the COBRA notification requirements. 29 U.S.C. § 1163(2).

5. 29 U.S.C. § 1166(a)(2) of COBRA requires the employer to give the plan administrator notice of the qualifying event within thirty (30) days of the event. 29 U.S.C. § 1166(a)(4)(A) in turn requires the plan administrator to provide notice of COBRA rights to the employee.

6. The plan administrator must provide notice of COBRA rights to the employee within fourteen days of its receipt of notice of the qualifying event. 29 U.S.C. § 1166(c).

7. The Plan administrator bears the burden of proving COBRA notice was given to the employee. Stanton v. Larry Fowler Trucking, Inc. 52 F.3d 723, 728 (8th Cir. 1995) abrogated on other grounds by Martin v. Arkansas Blue Cross Blue Shield, 299 F.3d 966 (8th Cir. 2002).

8. In this case, the employer timely notified the plan administrator of the qualifying event, and the plan administrator timely sent the COBRA notice to the employee.

9. "The statute does not specify the content of the notice that a qualified beneficiary must receive after a qualifying event has occurred. Neither the Department of Labor nor the Internal Revenue Service –the two agencies charged with interpreting and

---

[2] It is obvious the date of the letter should have been January 2, 2004. This date corresponds with the telephone logs (Ex O) showing inquiries about termination of coverage for non-payment of the premium.

enforcing ERISA–has issued regulations addressing the issue." <u>Chestnut v. Montgomery</u>, 307 F.3d 698, 702 (8th Cir. 2002). (Both parties acknowledged that such regulations were issued after the events which form the basis of this lawsuit).

10. The Eighth Circuit has held that a plan administrator satisfies the notice obligation by providing information that "adequately informed the qualified beneficiary of the coverage [he] was entitled to receive and the money that [he] owed in order to maintain coverage" and "the notice given must be sufficient to allow the qualified beneficiary to make an informed decision whether to elect coverage." <u>Id.</u>

11. Although Plaintiff asserts the COBRA notice did not contain information about the amount of money owed to maintain coverage, he stated it did contain enough information to allow him to make an informed decision about whether to elect coverage, and he did elect coverage. As such, Defendants provided sufficient COBRA notice to Plaintiff.

12. Defendant also asserts it provided Plaintiff the information about the money owed to maintain coverage a second time, when the November invoice was mailed to Plaintiff's home address. In this regard, Plan Administrators are not required to ensure that participants actually receive notice, but instead are obligated to use means "reasonably calculated" to reach plan participants. <u>DeGruise v. Sprint Corp.</u>, 279 F.3d 333, 336 (5th Cir. 2002).

13. "ERISA requires employers to maintain records sufficient to determine the benefits due or which may become due to its employees. 29 U.S.C. § 1059. It also imposes a record keeping requirement on plan administrators. *See* 29 U.S.C. § 1027." <u>Starr v. Metro Systems</u>, 2004 WL 1798362 (D. Minn). In this case, Defendant produced computer records showing an invoice was generated for Plaintiff on November 20, 2003, and testimony from its employees regarding the regular company procedure for mailing monthly invoices.

14. "The law presumes that a letter properly addressed, stamped and mailed was received by the person to whom it was addressed." <u>Id.</u> When proper evidence and/or records are presented that a plan administrator has a regular company procedure for mailing COBRA notices, and that the procedure was followed in any given instance, a claim of non-receipt is insufficient to overcome the presumption of receipt. <u>Id.</u>; <u>Roberts v. National Health Corp.</u>, 963 F.Supp. 512, 514-15 (D. S.Carolina 1997) <u>aff'd</u> 133 F.3d 916 (4th Cir. 1998)(evidence regarding established procedure for mailing

COBRA notice, and business records to show procedure followed in particular instance; claim of non-receipt insufficient); Keegan v. Bloomingdale's, Inc., 992 F.Supp. 974, 979-80 (N.D. Ill. 1998) (unrefuted evidence by plan administrator regarding adequate standard office procedures for generating and mailing COBRA notices along with unrefuted evidence showing procedures were generally followed in a given individual's case is sufficient to show good faith compliance with notice requirement. "Although the paper trail . . . ended with the printing of the notices, Defendants offered testimony explaining the routine mailing procedures, and it is unlikely that on two separate occasions Plaintiff's letter was not mailed with the rest of the batch that day. . . "); Jachim v. KUTV Inc., 783 F.Supp. 1328, 1333-34 (1992) (the issue is not whether Jachim received notice; rather the issue is whether KUTV caused notice to be sent in a good faith manner reasonably related to reach Jachim . . .[Defendant's] testimony tends to show that KUTV did cause the notice to be mailed. Jachim, on the other hand, does not offer any evidence challenging [Defendant's] testimony that she prepared the letter and mailed it in accordance with KUTV's standard procedures. Nor does Jachim offer any evidence that the letter was not retrieved from KUTV's mail bin and delivered to the United States Postal Service. Based on this record, this court concludes as a matter of law that KUTV satisfied its obligation under § 1166(a)(2) by timely sending adequate notice via first class mail to Jachim's last known address . . ."); Myers v. King's Daughter's Clinic, 912 F.Supp. 233, 236-37 (W.D. Texas 1996) aff'd 96 F.3d 1445 (5th Cir. 1996)(employer presented evidence of the customary mailing practices used in its business and records indicated notice had been sent; claim of non-receipt insufficient. "This court shares the view that § 1166 does not require proof that the notices required by that section be received."). The Eighth Circuit has recognized the mailing presumption would apply in appropriate circumstances. Stanton v. Larry Fowler Trucking, Inc., 52 F.3d 723, 729 (8th Cir. 1995).

15. Plaintiff received his COBRA notice, the contents of which are disputed. It is undisputed, however, that the contents were sufficient to provide Plaintiff with enough information to allow him to decide to elect coverage.

16. Plaintiff failed to pay the premium due within 45 days of election, as required by 29 U.S.C. § 1162(3).

17. Defendant has provided the Court with evidence about regular office procedures

regarding the mailing of its initial COBRA notices and the contents of those notices. That Plaintiff received his notice supports the supposition that the regular procedure was followed in this case. Defendant has also presented evidence and produced records regarding the monthly invoices mailed to COBRA participants. The Court finds that Defendant sent the notice and the invoice pursuant to a good faith procedure reasonably calculated to reach the Plaintiff. As such, Defendant has met its burden of proving it complied with the notice provisions of 29 U.S.C. § 1166.

18. Any of the above Conclusions of Law which are more appropriately Findings of Fact are by this reference incorporated into the Findings of Fact which appear above.

## CONCLUSION and ORDER

The Plaintiff received a COBRA notice which was sufficient to allow him to make a decision to elect COBRA coverage, and he did elect coverage. The Defendant has presented sufficient evidence of a regular office procedure, and has provided records regarding the COBRA notices and monthly invoices mailed to its COBRA participants in order to invoke the presumption that the notice and invoice were mailed to Plaintiff pursuant to a good faith procedure reasonably calculated to reach Plaintiff. As such, Defendant has met its burden of proving it complied with the notice provisions of 29 U.S.C. § 1166. Because Plaintiff did not pay his COBRA premium within forty five (45) days of election as required by 29 U.S.C. § 1162(3), Defendant properly cancelled Plaintiff's COBRA coverage retroactively to September 30, 2003, for non-payment of the premium. It is ORDERED that the Clerk shall enter a Judgment in favor of Defendant in accordance with these Findings of Fact and Conclusions of Law.

Dated this 17th day of August, 2005.

BY THE COURT:

John E. Simko
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, Clerk

By _Sharon Lulls_, Deputy

(SEAL)